IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, ex rel. JOSEPH M. THOMAS, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:17-CV-276 |
| DUKE UNIVERSITY, DUKE UNIVERSITY HEALTH SYSTEM, INC., WILLIAM M. FOSTER, PH.D., and ERIN N. POTTS-KANT, | ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Catherine C. Eagles, District Judge.

In this False Claims Act *qui tam* lawsuit, defendants Duke University and Duke University Health System contend that Virginia counsel for the plaintiff-relator Joseph M. Thomas violated their ethical duties in handling communications between the relator and his co-workers at Duke after the lawsuit was filed and while it was under seal. Duke seeks sanctions, including to disqualify the relator's Virginia counsel and to exclude communications between the relator and his co-workers from evidence.

Duke has not shown to the Court's satisfaction that the relator's counsel has violated either the North Carolina or the Virginia ethical rules. The motion will be denied.

## I. Background

The relator, a research analyst in Duke's pulmonary division, filed this False Claims Act *qui tam* lawsuit under seal alleging that the defendants had falsified and manipulated scientific research data used to obtain federal research grants. *See* Doc. 1. These allegations centered on data defendant Erin Potts-Kant purported to collect while working in defendant William Foster's laboratory in the pulmonary division at Duke. *Id.* The lawsuit was filed in the Western District of Virginia, and the relator was represented by Virginia counsel at the law firm Gentry Locke.

The relator continued to work for Duke after filing suit. While the lawsuit remained under seal, the relator spoke with co-workers about the alleged fraud and Duke's response to it. At the suggestion of Virginia counsel, he took notes about these conversations and shared information he learned from co-workers with his lawyers. At least some of these conversations tended to indicate that Duke was continuing to cover up the fraudulent data.

Duke concedes that relators can use information in their lawsuits that "ordinarily flow[s] to them" at work. Doc. 200 at 11. Duke contends that here, however, Virginia counsel deliberately orchestrated and directed conversations with Duke's employees and secured Duke's privileged information in violation of the applicable professional conduct rules. Virginia counsel deny orchestrating any conversations or misusing any privileged information.

## II. Applicable Law

### a. Disqualification of Counsel

Disqualification of counsel is a serious matter, and the moving party must meet a high standard of proof to show that opposing counsel should be disqualified. *See, e.g.*, *Plant Genetic Sys., N.V. v. Ciba Seeds*, 933 F. Supp. 514, 517 (M.D.N.C. 1996); *Tessier v. Plastic Surgery Specialists, Inc.*, 731 F. Supp. 724, 729 (E.D. Va. 1990). Whether sanctions are appropriate is a matter within the court's inherent authority and district courts in this circuit typically require proof of willful misconduct by clear and convincing evidence. *See, e.g.*, *Dillon v. BMO Harris Bank, N.A.*, No. 1:13-CV-897, 2016 WL 5679190, at *9 (M.D.N.C. Sept. 30, 2016) (collecting cases from other circuits), *aff'd sub nom.* on other grounds, *Six v. Generations Fed. Credit Union*, 891 F.3d 508 (4th Cir. 2018); *U.S. ex rel. Rector v. Bon Secours Richmond Health Corp.*, No. 3:11-CV-38, 2014 WL 66714, at *5 (E.D. Va. Jan. 6, 2014); *see also In re Liotti*, 667 F.3d 419, 425 (4th Cir. 2011) (stating that "the proper standard of proof for violations of the relevant rules of professional conduct is 'clear and convincing evidence'" for the purpose of imposing attorney discipline).

In addition, "[t]he drastic nature of disqualification requires that courts avoid overly-mechanical adherence to disciplinary canons at the expense of litigants' rights freely to choose their counsel." *Shaffer v. Farm Fresh, Inc.*, 966 F.2d 142, 146 (4th Cir. 1992). Moreover, courts must "always remain mindful of the opposing possibility of misuse of disqualification motions for strategic reasons." *Id.*

### b. Rules of Professional Conduct

Both the North Carolina and Virginia ethical rules prohibit a lawyer from communicating with a person the lawyer knows to be represented about the subject of that representation, absent consent of that person's lawyer. N.C. R. Prof'l Conduct Rule 4.2; Va. Sup. Ct. R. pt. 6, § 2, Rule 4.2.[1] Both states also prohibit lawyers from using methods of obtaining evidence that violate the legal rights of third persons. N.C. R. Prof'l Conduct Rule 4.4(a); Va. Sup. Ct. R. pt. 6, § 2, Rule 4.4.[2] In both states, it is professional misconduct for a lawyer to violate these or other rules "through the acts of another." N.C. R. Prof'l Conduct Rule 8.4(a); Va. Sup. Ct. R. pt. 6, § 2, Rule 8.4(a).[3]

---

[1] Rule 4.2 of the North Carolina Rules of Professional Conduct states that "[d]uring the representation of a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order." Rule 4.2 of the Virginia Rules of Professional Conduct provides that "[i]n representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so."

[2] Rules 4.4 of the North Carolina Rules of Professional Conduct and the Virginia Rules of Professional Conduct state that "[i]n representing a client, a lawyer shall not . . . use methods of obtaining evidence that violate the legal rights of [a third person]." Both states have adopted Comment 1, which specifies that it is "impractical to catalogue all such rights [of third persons], but they include legal restrictions on methods of obtaining evidence from third persons." The North Carolina rules go on to comment that this includes "unwarranted intrusions into privileged relationships, such as the client-lawyer relationship." N.C. R. Prof'l Conduct Rule 4.4 cmt. 1.

[3] The parties disagree as to whether the North Carolina or Virginia rules apply. The states differ as to which corporate employees qualify as "persons" with whom counsel cannot communicate under Rule 4.2, and such determinations are not necessarily straightforward. *See, e.g.*, Geoffrey C. Hazard, Jr. & Dana Remus Irwin, *Toward A Revised 4.2 No-Contact Rule*, 60 Hastings L.J. 797, 831 (2009); Stephen M. Sinaiko, *Ex Parte Communication and the Corporate Adversary: A New Approach*, 66 N.Y.U. L. Rev. 1456, 1457–59 (1991). *See generally* Dean S. Rauchwerger, Shawn K. Jones & Allison K. Baten, *Getting the Winning Edge: Appreciating the Permissible Boundaries in* Qui Tam *and Other Litigation Contexts for Contacting Your*

The few cases addressing whether an attorney has committed misconduct by acting through his client indicate that a client is free to act independently in talking with potential witnesses, but ethical problems arise when lawyers cause or assume control and direction over those conversations.[4] *Compare Miano v. AC & R Advert., Inc.*, 148 F.R.D. 68, 87–89 (S.D.N.Y 1993) (finding no ethical violation where plaintiff taped conversations with defendant's employees and discussed these conversations with his attorney because the attorney did not "suggest, plan or supervise" what his client did and mere knowledge of his client's activity and receipt of information was not sufficient to show the attorney "caused" his client's behavior), *and Mathis v. Leggett & Platt*, No. 1:04-CV-3703, 2006 WL 8431959, at *2–3 (N.D. Ga. Apr. 5, 2006) (finding no ethical violation where there was "no evidence indicating that Plaintiff's counsel prompted, directed, or caused" his client to ask defendant's employee to confirm if her signature on a document was authentic), *with Holdren v. Gen. Motors Corp.*, 13 F. Supp. 2d 1192, 1193, 1195–96 (D. Kan. 1998) (finding attorney violated professional rules when he told his client it would be a "good idea" to obtain sworn statements from defendant's employees and advised his client on how to draft affidavits), *and Meachum v. Outdoor World Corp.*, 654 N.Y.S.2d 240, 249–50 (1996) (finding attorney violated professional

---

*Adversary's Current & Former Employees*, 40 False Cl. Act and Qui Tam Q. Rev. 14 (Jan. 2006). As discussed below, Duke has not shown that counsel caused, directed, or controlled the relator's communications with his co-workers, so whether these co-workers are "persons" under either rule is immaterial. The Court makes no findings as to whether either state's version of Rule 4.2 covers any or all of the co-workers who talked with the relator.

[4] Neither party identified or addressed these cases in the briefing. *See* Doc. 160; Doc. 189 (redacted at Doc. 185); Doc. 200; Doc. 211.

rules when he proposed that plaintiff tape a call with defendant's employee, dialed the number for plaintiff, listened to the conversation without announcing himself, and used this tape to draft the complaint). *See also San Francisco Unified Sch. Dist. ex rel. Contreras v. First Student, Inc.*, 213 Cal. App. 4th 1212, 1233 (2013) (noting that "[c]ase law and other legal authority clearly establish that the individual plaintiffs' contacts with [the defendant's] employees violated [the California equivalent of Rule 4.2] only if the contacts were wrongfully orchestrated by plaintiffs' counsel").

### III. Discussion and Findings[5]

Duke contends that Rules 4.2, 4.4, and 8.4, read together, prohibited Virginia counsel from deliberately soliciting information from Duke employees through the relator once he filed this lawsuit and once it became apparent Duke was represented by counsel.[6] The motion thus turns on Duke's factual assertions that Virginia counsel knew Duke was

---

[5] The Court finds the facts stated for purposes of this motion only. In addition to the evidence submitted by the parties, the Court has considered the allegations of the Amended Complaint to the extent one or more of the defendants has admitted them. The Court has drawn reasonable inferences from the evidence and made credibility determinations in light of the record as a whole. The Court has largely accepted the relator's affidavit, Doc. 190, as credible; Duke has not contradicted sizable parts of it, and the relator's testimony is generally consistent with common sense. To the extent Duke has offered contrary evidence, the Court does not think it means as much as Duke thinks it means and otherwise does not find it persuasive. The Court has disregarded the many purported facts in Duke's briefs that do not withstand a dispassionate analysis of the cited supporting evidence, as well as those stated without citation to any evidence at all. *See* Doc. 110 at ¶ 1 (the Court's order indicating that "factual assertions unsupported by citation to specific evidence in the record will be disregarded"). If the Court applied a lower preponderance-of-the-evidence standard, its factual findings would not change.

[6] *See* Doc. 160 at 11 (framing the question presented as whether the actions of Virginia counsel "in supervising [relator's] *ex parte* interviews with Duke employees" violated rules of professional conduct); Doc. 200 at 3 (claiming that Virginia counsel "orchestrated a plan in which [relator], posing as a concerned co-worker, solicited information from unsuspecting Duke employees").

6

represented by counsel in connection with the Foster lab data issue and thereafter caused, directed, or controlled the relator's post-lawsuit conversations with co-workers.

As noted above, claims that an attorney has violated ethical rules through the acts of his client require a fact-specific analysis. Relevant factors include, *inter alia*, the context in which the relator's communications with his co-workers occurred, the nature of the information gathered, and counsel's participation in collecting and using that information.

### a. The relator's communications with his co-workers

Soon after Duke fired Ms. Potts-Kant in March 2013, researchers in the Duke pulmonary division became aware that she may have manipulated data while working in the Foster lab. Widespread interest in the possibility of fraudulent research and efforts to evaluate whether data was reliable led to many conversations among researchers, including with the relator.[7]

After filing the *qui tam* lawsuit in May 2013, the relator complied with the False Claims Act's requirement that he keep the lawsuit confidential while under seal.[8]

---

[7] In addition to the relator's summary of conversations with his co-workers, Doc. 166, and the relator's declaration, Doc. 190, Duke's own internal documents confirm this was the case. *See* Doc. 176-10 at ¶ 3 (report of Duke's Research Integrity Officer that, in preparation for a May 9, 2013, data submission and later site visit, "there was frequent and constant conversation among the researchers . . . as they worked to determine what data were appropriate to use"). Duke has provided no evidence to the contrary.

[8] False Claims Act cases filed by individuals are, by statute, filed under seal and no summons is issued for at least 60 days while the government investigates to decide if it will intervene. 31 U.S.C. § 3730(b)(2). During this time, relators and their counsel are required to maintain silence about the existence of the lawsuit. *State Farm Fire & Cas. Co. v. U.S ex rel. Rigsby*, 137 S. Ct. 436, 442 (2016) (noting that § 3730(b)(2) "creates a mandatory rule the relator must follow"). In

Consistent with statutory protections for whistleblowers, he continued to work for Duke for over a year after filing suit, as the False Claims Act contemplates.[9] He did not tell his employer or his co-workers that he had filed a lawsuit against Duke until shortly before he left Duke's employment.

Although the relator did not work directly in the Foster lab, he did work with Ms. Potts-Kant before Duke fired her, and a grant tied to Ms. Potts-Kant's data paid for part of his salary. He co-authored one paper with Dr. Foster and Ms. Potts-Kant (among others), and he later helped determine whether some of the data Ms. Potts-Kant produced could be replicated. It is therefore not surprising that the relator participated in discussions with co-workers about the Foster lab data.

The relator and his co-workers continued to discuss the Foster lab data issue throughout 2013 and 2014, and his co-workers also continued discussions amongst themselves. *See, e.g.*, Doc. 166 at 15 ("Ledford said that Que told her that she used to be only able to run eight mice per day on a *flexi*Vent machine."); *id.* at 52 ("[Theriot] stated that she and Que had a discussion last week . . . ."). In these conversations, researchers

---

this case, the seal was extended several times and was in place for over three years. *See* Doc. 1 (showing case filed on May 17, 2013); Doc. 36 (order lifting the seal on August 9, 2016).

[9] The False Claims Act offers whistleblower-employees protection from retaliation in employment, 31 U.S.C. § 3730(h), making it clear that Congress contemplated many *qui tam* whistleblowers would be employees who continued to work for defendants after filing suit. *See generally* John T. Boese, *Civil False Claims and* Qui Tam *Actions* § 4.01[B][1] (4th ed. 2018) (noting that the most common *qui tam* plaintiff is the current employee). Employees have particular importance to the Act's whistleblowing scheme because of their familiarity with their employers' businesses and their access to internal information. Stephen M. Payne, *Let's Be Reasonable: Controlling Self-Help Discovery in False Claims Act Suits*, 81 U. Chi. L. Rev. 1297, 1303 (2014).

8

talked, shared information, and speculated about the allegedly falsified research data, the ongoing tests to evaluate whether the data could be replicated, how Duke was dealing with grant-making entities and publications over the questionable data, how the fall-out might affect careers and the future of the pulmonary division, what pulmonary researchers were leaving Duke, and other matters of personal and professional interest. *See generally* Doc. 166. Many of these conversations were work-related and involved tasks of shared interest; others appear to have resulted from a natural human tendency to talk about matters of common concern. All of the relator's relevant conversations were with people with whom he ordinarily had work-related contact and a number of the conversations appear to have been initiated by his co-workers.

Assuming without deciding that at some point in the summer of 2013, Virginia counsel knew Duke had retained counsel in connection with the Foster lab data issue,[10] there is no direct evidence that Virginia counsel thereafter caused, controlled, or directed the relator's conversations with his co-workers. Nor is the circumstantial evidence on which Duke relies persuasive.

In asserting otherwise, Duke relies on the relator's admission that he regularly reported what co-workers shared with him to Virginia counsel and took notes of his

---

[10] As previously noted, lawyers are only prohibited from communicating with those persons they "know[] to be represented by another lawyer" and only "about the subject of the representation." *See supra* note 1 (quoting Virginia and North Carolina versions of Rule 4.2). The record is not clear as to exactly when lawyers began representing Duke in connection with the Foster lab data issue, as is discussed in more detail in the Court's order addressing the motions to seal entered this same day, much less when Virginia counsel should have known of the representation. The summer of 2013 is a generous assumption in favor of Duke.

interactions at his counsel's suggestion. *See* Doc. 160 at 13; Doc. 159-1 at 4; Doc. 189 at 5 (redacted at Doc. 185). However, there are many legitimate reasons for counsel to ask a client to take notes about what he sees and hears and to provide that information to counsel. These include the need for an aid to memory as time passes, compliance with Rule 11 of the Federal Rules of Civil Procedure when filing or amending a complaint, avoiding liability under 31 U.S.C. § 3730(d)(4), insuring that all supporting information is provided to the government as required by 31 U.S.C. § 3730(b)(2), compliance with the disclosure requirements of Rule 26(a)(1) of the Federal Rules of Civil Procedure after the matter is joined, and providing complete discovery responses. [11]

It would be a strange result indeed if a *qui tam* relator could not take notes or tell his lawyers about facts and actions which would support the claims in his lawsuit, such as the confirmation that the allegedly false data could not be replicated, or which would support continuing and additional violations of the False Claims Act, such as statements tending to indicate Duke was attempting to hide or minimize the false data in its communications with outsiders, including governmental funding sources.[12] The Court declines to infer from Virginia counsel's receipt of information and suggestion to take

---

[11] In an employment discrimination case claiming failure to promote, for example, it would be ludicrous to suggest that the employee-plaintiff could not talk to his or her lawyer about what co-workers or supervisors said that might be relevant to the lawsuit.

[12] While Duke concedes that *qui tam* whistleblowers "can obtain information for use in their lawsuits that ordinarily flow to them," Doc. 200 at 11, it does not acknowledge that its position on note-taking and sharing information with counsel would effectively prevent such evidence from ever seeing the light of day. One might suspect that a desire to exclude harmful evidence is driving this motion for sanctions. *Shaffer,* 966 F.2d at 146 (noting potential for misuse of disqualification motions for strategic reasons).

notes that counsel directed or controlled the relator's underlying interactions. *See Miano,* 148 F.R.D. at 87–89; *Mathis,* 2006 WL 8431959 at *2–3.

Duke further contends that the number of the relator's conversations and questions about the Foster lab data issue supports the inference that Virginia counsel were directing these communications. The Court is not persuaded. Overall, the evidence shows that there was widespread serious concern about the Foster lab data issue and its ramifications. A number of people working in close proximity to the relator as well as the relator himself were trying to replicate the data. Several researchers left the Duke pulmonary lab in the wake of the problems. Conversations about the fraud, its professional and personal implications, and the efforts to replicate results would have been perfectly normal in this context. Moreover, many of the questions the relator asked were general and typical of ordinary conversation, with little to indicate a targeted inquisition.[13] Given that the relator worked for Duke for well over a year after filing suit

---

[13] Duke indirectly contends that the relator could not ask his co-workers any questions about the lab fraud, asserting these exchanges were unfair because the relator's co-workers did not know he was the whistleblower. But the False Claims Act required the relator to keep his involvement confidential, *see supra* note 8, and it is not clear how the relator could have tried to replicate Ms. Potts-Kant's data without asking at least some questions. Even if the relator's motivation was to obtain relevant information for his lawsuit, this is a goal contemplated by the False Claims Act. *See supra* note 9. As one commentator has noted in the context of documents, "the FCA contemplates and condones gathering and producing documents prior to service of the complaint and the beginning of formal discovery." Joel D. Hesch, *The False Claims Act Creates A 'Zone of Protection' That Bars Suits Against Employees Who Report Fraud Against the Government*, 62 Drake L. Rev. 361, 418 (2014). In any event, the relevant rules of professional conduct prohibiting contact with represented persons apply only to counsel and do not apply to the relator, and Duke has cited no case to the contrary. *See Mathis*, 2006 WL 8431959 at *3 ("[T]he Court is not aware of any authority in this Circuit or elsewhere suggesting that a party, as opposed to an attorney, is prohibited from engaging in communications with a represented adverse party."); *San Francisco Unified Sch. Dist. ex rel. Contreras*, 213 Cal. App.

and the significant interest all pulmonary division employees had in the Foster lab data fraud, the number of conversations the relator had with his co-workers is neither surprising nor suspicious.

### b. The handling of potentially privileged information

There is also no persuasive evidence that counsel sought or used allegedly privileged information inappropriately. The relator did not communicate directly with Duke counsel and declined the opportunity to do so later when Duke requested an interview. Duke has not alleged that the relator obtained any privileged documents. Much of the information Duke asserts to be privileged is not so, as discussed in detail in the Court's order on various motions to seal entered this same day. Other exchanges mentioning Duke counsel were shared with the relator in a context tending to indicate any possible privilege claim was waived.[14] Moreover, Duke has not cited to any statements in the Amended Complaint or otherwise where Virginia counsel made use of purportedly privileged information, much less inappropriate use.[15]

---

4th at 1229 (noting that "contacts with [defendant's] employees by the individual plaintiffs on their own initiative are clearly exempt" from the California equivalent of Rule 4.2).

[14] There is nothing in the information Virginia counsel had at the time, and nothing in the record now, to show that the relator's co-workers talked with him in order to obtain information counsel needed to provide legal advice or that Duke had taken steps to protect the confidentiality of communications like the ones Duke is now claiming are privileged. *See* David. M. Greenwald, *Testimonial Privileges* § 1:83 (3d ed. 2017) ("Where a corporation or other organization is the client, waiver may occur when otherwise privileged materials are circulated to persons not assisting in furnishing information to the lawyer or acting upon legal advice received from the lawyer.").

[15] There were additional appropriate actions Virginia counsel could have taken once it became clear that the relator's co-workers were freely discussing interactions with counsel, such

Otherwise, Virginia counsel has been sensitive to attorney-client privilege issues throughout this case, further undermining an inference of misconduct. When furnishing the relator's interrogatory answers, which summarized his communications with co-workers, Virginia counsel redacted text mentioning Duke counsel from disclosure to co-defendants so that Duke would have the opportunity to claim the attorney-client privilege. When Duke inadvertently disclosed a large amount of potentially privileged attorney-client material in discovery, Virginia counsel immediately brought the matter to Duke's attention and followed up when Duke did not respond.

These facts differ substantially from the cases on which Duke relies, where the documentary information counsel obtained was clearly privileged and was used in pleadings. In *U.S. ex rel. Frazier v. IASIS Healthcare Corp.,* the relator was an attorney and the Chief Compliance Officer of the defendant organization who had taken approximately 1,300 pages of documents before departing the company and filing a *qui tam* action. No. 2:05-CV-766-RCJ, 2012 WL 130332, at *1, 3 (D. Ariz. Jan. 10, 2012). Some of these documents had attorney-client privilege headings—the specific documents at issue in the motion for sanctions had the title of "Legal Memo" —and yet counsel "feigned ignorance" as to possessing privileged information when asked. *Id.* at *5, 7, 15. In *United States ex rel. Hartpence v. Kinetic Concepts, Inc.,* the relators took documents

---

as seeking guidance from the Court. *See, e.g.*, *United States ex rel. Hartpence,* 2013 WL 2278122, at *2. However, the availability of other appropriate alternative options does not mean Virginia counsel violated ethical obligations, and counsel's actions are not judged with 20/20 hindsight or in light of facts Virginia counsel could not have known.

13

from the defendant company when they left, including communications with the defendant's attorneys. Nos. CV 08-1885-GHK (AGRx), CV 08-6403-GHK (AGRx), 2013 WL 2278122, at *1–2 (C.D. Cal. May 20, 2013). Counsel for the relators quoted directly from privileged documents in their pleadings, despite notice from the U.S. Attorney's office that the documents were likely privileged. *Id.* at *2–3. The conduct of Virginia counsel here does not approach the conduct in *Frazier* or *Hartpence*.

Duke implies that it is professional misconduct for a lawyer to fail to instruct a relator-client to walk away or to refuse to listen when co-workers mention anything about their employer's lawyers, but it has cited no case for such an overbroad proposition.[16] As discussed more fully in the Court's order on the motions to seal entered this same day, not all communications that mention counsel are protected by the attorney-client privilege, which is "strictly confined within the narrowest possible limits consistent with the logic of its principle." *Solis v. Food Emp'rs Labor Relations Ass'n*, 644 F.3d 221, 226 (4th Cir. 2011) (internal quotations omitted).

---

[16] There is no evidence before the Court as to what instructions Virginia counsel did or did not give the relator about potentially privileged information he received from his co-workers. Duke emphasizes that Virginia counsel did not submit affidavits affirmatively setting forth advice given to the relator, *see* Doc. 200 at 2–3, 6, but Duke has cited no case requiring the relator to waive his attorney-client privilege merely because an opposing party accuses his lawyers of misconduct. The Court agrees that *qui tam* counsel should always proceed cautiously when receiving information from their client that might be protected by the attorney-client privilege and that careful advice may well be appropriate. *See generally* Robert T. Rhoad, *Ethical Issues Arising in Healthcare Fraud Investigations and False Claims Act Qui Tam Cases*, 27 No. 1 Health L. 29, 35 (2014) (discussing the numerous obligations *qui tam* counsel must balance). But the burden here is on Duke to show misconduct, not on Virginia counsel or the relator to show the absence of misconduct.

## IV. Conclusion

Duke has not proven misconduct, let alone willful misconduct, by clear and convincing evidence or by the preponderance of the evidence. The Court will deny the motion for sanctions.

This does not necessarily mean that all of the statements that co-workers made to Mr. Thomas are admissible. It is obvious, for example, that some are speculative and others are not based on personal knowledge. A number contain multiple layers of hearsay. Whether a particular statement constitutes an admission or is otherwise subject to an evidentiary objection are questions that can be decided later, if and when that becomes necessary.

It is **ORDERED** that Duke's motion for sanctions, Doc. 159, is **DENIED**.

This the 4th day of September, 2018.

_____
UNITED STATES DISTRICT JUDGE